First and foremost, I wish to take a moment to thank each of you for once again allowing me as a non-attorney to participate in the public discussions of the appeal I've written for your consideration. This case presents two distinct but intertwined issues. Trying to demonstrate Phillips was prejudicially denied due process in a trial this court can have no confidence in. The district court's ruling is contrary to the law of this case. The circuit in court law clearly established before Phillips' guilt trial. As this court in Phillips v. Woodford obtained held Phillips reserved ineffective assistance to counsel because defense counsel did not reasonably select the alibi defense and remanded for an evidentiary hearing. Mr. Phillips, this is Judge Kleinfeld. As I understand the record in this case, you told him you weren't there. You told him you had an alibi defense. He told you it was not likely to be a very good defense. You insisted on it. He scurried around getting evidence and he actually found some. He found somebody who basically met somebody who said he was in a shoot or saw somebody in a bar who said he was in a shootout at the location of the crimes at about the right time and the person didn't look anything like you. And he told you it wouldn't be a good alibi defense because he wouldn't say who you were with who would be your alibi witnesses. But he presented it because that's what you insisted was the truth. What is deficient performance about a lawyer doing that? Well, I think before he could accept my statement, which the state has not refuted, I made on the very first interview with Paul Martin that I'll say, screw him, I'll just say I wasn't there. That doesn't eliminate his responsibility to investigate the charges, the evidence available to him through the police reports, etc. But he did. Well, I do not believe that had he fully investigated, he would have gone with an alibi defense. It is my position that he would have said, this is not a good defense and this is alternative defense that is functional. What's he supposed to do if you insist that the alibi defense is the truth? Was he supposed to tell you to lie and say something different from what you insisted was the truth? No, but he should have said, no, you should not lie and say you were not there. And the defense you think he should have presented was the shootout defense. Is that right? Well, I think he should have put it on a defense that it was not first degree murder and that it was not a robbery. The shootout in and of itself, as you pointed out in the dissent in Phillips v. Woodford, is not a viable defense under California law, but it is combined with other points. It attacks the state's primary case, which was that it was a robbery murder. All right, continue, Mr. Phillips. Thank you. I argue this in reverse of the order I wrote the brief. So they sent in my reply brief, filling me in light of the in back panel of this court, citing to Phillips v. Woodford as the least circuit precedent in the issue of false and Hayes v. Brown. At this point, it's a bit like the tail wagging the dog. I respectfully disagree with the state's position articulated in their response brief that Wilhoite and not Hayes should control in this case, if for no other reason than this. In Wilhoite, Madera County District Attorney David Muneer told the jury, there is a deal. He just didn't bother to go into the additional secret layers of the deal. The witness had no knowledge of it. In Phillips' case, the same David Muneer told the jury, there is no deal. This is exactly what the Hayes jury had been told. In Phillips, the and withheld from the defense, a letter he had personally authored and sent to Cassandra Dunn, counsel for Sharon Coleman, Phillips' co-defendant. This letter stipulated that, in exchange for Coleman's assistance in the apprehension of Phillips, in her testimony at his trial, all charges against Coleman would be dismissed. This letter is reflected at reply brief page 39A, as it was lately provided to us. Of note is that this letter does not require Coleman to testify truthfully. Only did she testify in accordance with her initial statement to law enforcement, which Muneer reminded Dunn, we have on tape. This, the district court, or the district attorney, then stepped back and allowed Coleman's testimony to go uncorrected, making it an approved violation. Muneer's scheme to avoid rating disclosure is precisely what the United States Supreme Court recently held in Banks v. Dratecki to be a prejudicial violation of due process. Counsel, I thought we had a finding of fact, correct me if I'm wrong, by the district judge that because of this prosecutor's way of doing deals with the lawyer and insisting that they tell the client that Coleman did not know she had a firm deal and the prosecutor did not know that her lawyer had, if he had, disobeyed his instructions not to tell her. It isn't a violation to put on testimony that is false but not perjurious, and it isn't a violation to put on perjurious testimony if the prosecutor does not know that it's perjurious. How do you get around the district court's findings of fact on those points? Well, I think the law is clear that it is a violation to put in false and misleading testimony. That's been since Alcorta and Pyle. You're right about that, but you've got to take it the next step. It has to be knowingly false, and the prosecutor putting it on has to know that it's false. And I don't see how you get to that next step. I think that the step is that Coleman or the, I'm skewed, the way you get to that step is through the footnote in Phillips v. Woodford where it outlines it is the attorney's responsibility to advise their client of everything that's done to say, well, okay, here, trust me, pat him on the back, we'll take care of this. And meanwhile, you're out on $10,000 bail facing capital murder, and then you assist in a phone call that you deny you assisted in, and this dropped to an O.R. At some point in time, it becomes absurd to say Coleman didn't know that there was a deal, that she did not know the specifics of the deal is an arguable point, but she knew there was a deal. And did the prosecutor know that she knew? I think he asked to. I thought Muneer had that thing going where he would make deals with the lawyer and say, don't tell your client. I assume because he wanted the client to be able to testify truthfully that as far as she knew, she had no deal. That was Muneer's scheme to avoid Brady's disclosure, yes. So basically, she must have known and he must have known that she knew, you argue, because of the ethical duty that her lawyer would have had, you think, to tell her about the deal? That's correct. Got it. Thanks. Proceed, Mr. Phillips. Okay, thank you. The one point that the district court did get correct about this was on excerpt page 186. The district court held that Muneer had constructive knowledge through detective Flores of the benefits given Coleman by Fresno County. Finally, there can be no retreat from the fact that when David Muneer took the stand, underwrote, and chose to play word games, he places his thumb on the scales of justice backed by the full weight of the district attorney's office. One does not get much more material than a prosecutor as a witness. And when a federal deposition questioned about his word games, Muneer on page 539 of my excerpts calls the majority's in the quote. Then laments in excerpt page 541, quote, if people don't understand English, that's not my problem, end of quote. Then saying this panel is playing legal games, talking about the responsibility of a client's agent. But it's our position that the materiality threshold is met as to both witnesses under the law. The next I would turn to claim B. As noted on page 41 of my order, or my disappeal rather, the district court changed midstream the format, ordered hearing, limiting testimony to select depositions only. And it became necessary for claim B to consume 40% of the allotted page count in a large portion of the reply brief. So unless the court has any questions regarding claims A and B, I would rest them both on the briefing except to make this point. In Belmontes v. Errors, that's at 529 Bed 3rd at 863, this court held the standard of quote, unlikely, end of quote. As was used by the district court in Phillips was the wrong standard when assessing sufficiency to undermine confidence in the outcome of a trial. The laws of this circuit established in Sanders v. Rittel, built upon in Brown v. Meyers, emphasized that quote, a probability sufficient to undermine confidence in the outcome, end of quote, is a fairly low threshold. And where deficient representation, alleged in counsel's failure to inquire whether the evidence may have put the case in a different light. It is not, however, necessary to show counsel's deficient conduct, quote, more likely did not alter the outcome of the trial, end of quote. That's from Sanders at 1461. I have, again, the advice of this advisory counsel, always been blunt in my arguments and my filings in the federal court. When I said Phillips, Rose, Bartulas, and Coleman all chose to be participating in criminal activity. And there is no doubt that Phillips would have been convicted of very serious crimes. However, at defense counsel investigating the point set forth in this claim, there's a reasonable possibility or probability that he would have had doubts respecting guilt as charged. My last thought on that is in Phillips v. Woodford, footnote 12, the majority held that if the jury knew Coleman lied about one point, they may not believe their testimony on another point. This analysis of an impact on the jury by an exposed lie must extend to Ron Rose. If the jury knew not only of Rose's deliberate lie to law enforcement, discussed the page 64 through 68 of this appeal, but also the fact that several weeks before the confrontation, weeks before the cocaine arrived in the United States, Bruce Bartulas was aware Rose now felt it necessary to be armed at all times. And Bartulas took Rose's feelings about being armed so seriously that when Bartulas discovered Rose had inadvertently left his gun in Bartulas's vehicle, Bartulas got off the freeway, went through the congestion back to the beach for the sole purpose of returning Rose's gun to him. This is discussed in my excerpts of page 63. As the jury heard that earlier in the week Rose had been warned about carrying an unloaded weapon when going to the Madera meeting, they may not have believed Rose's testimony when he was going to a clandestine midnight meeting carrying the most powerful handgun then available, but it wasn't loaded. This is all information available to defense counsel pre-trial and would have been admissible as habeas to the testimony of Detective Flores and Investigator Mulvihill, but the district court refused to consider it. That's, unless the court has any questions, that's what I have and would ask that I be able to be permitted to retain the rest of my minutes for a summary after Ms. Hart's certainly. All right, we'll hear from the state. And Ms. Hart, I assume you have nothing to say. Well, could you advise me as to how much time we have because I do have some remarks and perhaps I should just go ahead. I have some remarks because Justice Kleinfeld's questions here about the reliance on the alibi that I wasn't there. There are, I think, two cases that are important in that area, the Sanders v. Rattel at 21 F. 3rd, 1335, 9th Circuit, 1994 and the Johnson v. Baldwin, 114 F. 3rd, 835, 9th Circuit, 1997. In that case, the attorney said that he was not there. There was an alibi defense there, but this court ruled that the attorney had a duty to make a reasonable investigation to come to an informed decision. And in Johnson v. Baldwin, the same decision was made that the attorney should not have relied on an unsupported alibi defense. Now, if I could just step one moment out of the role of appellate lawyer into the role of trial lawyer because I have done many, many murder trials, it is so common, it is so frequent for a defendant to say, I wasn't there, I wasn't there. Sometimes they even have family members who say that the defendant was home in bed all night. The attorney has a duty independent of what the client states, the duty independently to investigate. And clearly here where Mr. Phillips did not supply names and residences of any alibi witnesses, and clearly here where Mr. Phillips left and went to Utah, and flight can be, you know, consciousness of guilt and flight would tend to show perhaps that he was there, we submit that Mr. Martin had a duty independently to investigate that case because the alibi defense was weak and unsupported. And Ron Rose, Sharon Coleman, the individual Mr. Phillips had been living with, said that he was there and that Mr. Martin failed to do the follow-up investigation. Mr. Gerke, the defense investigator at the time of trial, had a number of notes and the notes were suggestive of lines of inquiry on the installation business, on talking to Cameron Nichols, on talking to Braybill, on talking to Gary Bishop. There were whole lines of inquiry that remained totally undeveloped and should have been developed, should have been a ballistics evaluation of it. There should have been, Martin also as part of investigation should have gotten hold of the earlier reports and impeached Ron Rose and impeached Sharon Coleman with prior inconsistent statements. That was not done. Neither one of those witnesses at trial was impeached with prior inconsistent statements that could have simply eviscerated the whole issue of Ron Rose. Sharon Coleman, for example, in her December 28, 1977, interview with law enforcement makes no mention that Phillips had a discussion on the way back to Sacramento about Ron Rose not having enough money on him. The whole subject of discussion was that he had been double-crossed. So clearly there are whole lines of impeachment that were totally uncovered and a whole line of and the duty is independent of what the client tells the lawyer. Certainly that's, I mean, I think there's two nubs of the case. One nub is that Phillips lied to his attorney. So the attorney has the duty independently to investigate. And then on the issue of the perjury, I think the district court was relying on the old Hayes case before this court en banc changed the ruling of Hayes because clearly the district court thought no harm, no foul. The individual, Sharon Coleman, didn't have knowledge of the deal. Therefore, she was insulated. This court in the en banc decision, in Hayes v. Brown, has ruled just the opposite at 399 F-3972 that the state went to such great lengths in that case. That was Terrence Van Oss, district attorney out of San Joaquin County, went to great lengths to insulate the witness. And so the whole question is, if the state goes to such great lengths to insulate a witness, then the witness has more of an incentive to create a story that will supply everything that the state wants to prove. So the fact is that Muneer did testify out of the presence of the jury. Muneer did testify there was no deal. How can you parse it and say that just because the deal wasn't communicated to Sharon Coleman, there was no deal? He argued in his final argument to the jury that there was no deal. He conceded that she expected some type of favor, but he argued that there was no deal. And the prosecutor, of course, has a special role in this system of U.S. 78. So the effect certainly was perjurious. Excuse me, can you tell me the name of the unbanked case you were talking about? Oh, I'm talking about the Hayes case. I'm talking about the Hayes v. Brown, 399 F-3972. That was the case out of San Joaquin County that involved an individual who was killed in a motel by a person who was a resident in the motel and an individual named James, who was not a co-defendant charged with the crime, but he was given a deal on some pending charges. And the issue was, and he supplied a statement. I just wanted the name. I understood the argument. All right. All right. Thank you. All right. We'll hear from the state now. May it please the court. I'm Todd Marshall on behalf of Respondent Warden Wong. Phillips is a cold-blooded killer. He shot Bruce Bartulis through the chest at point-blank range. He attempted to kill Ron Rose by shooting him five times, lighting him on fire, and running him down with an automobile. Over the years, Phillips has become a master prevaricator and manipulator. He weaves his lies within the fabric of truth to give them an aura of plausibility. However, there's no disputing that he lied to both his lawyer and to his first jury when he swore that he was not present. He even had the audacity to put a hit out on his mother when she refused to cooperate and corroborate his false alibi. In his early habeas pleadings in state court, Phillips admitted shooting both victims but claimed it was in self-defense. He now has got a third story in which he says there was a shootout between himself and Rose and Bartulis, but rather that Rose shot Bartulis by accident. The pathologist made it abundantly clear during his post-remand depositions that the bullet traveled through Bartulis from left to right. There is no possibility that Rose shot Bartulis. This Court should find that there was no prejudice from counsel's conduct, and further, that there was no deficient performance. Also, this Court should find any time there's a credibility dispute between Mr. Phillips and any other person that he is the least credible person. The district court found as much. Phillips has refused to subject his versions to cross-examination when he refused to participate in his deposition. Counsel, in reading the various declarations that Mr. Martin has given in his deposition, seems to be some very inconsistent positions that he as the lawyer was taking, and that is something that's concerning to me. He explained in his second declaration that his statements made at the time of the first evidentiary hearing were without the benefit of the review of materials, which would have helped him understand clearly what had actually transpired. And more importantly, he fully explained in the depositions below regarding his statement that he did not find that the alibi had any merit. He explained that he never formed the opinion to believe or disbelieve Phillips or any other defendants, and that Phillips' insistence in the face of contrary evidence that he wasn't there gave some weight to his belief that it was, in fact, true. Also, Martin didn't believe Coleman and Rose. He was inclined to believe his client. Martin admitted that he thought the defense was weak without the alibi witnesses. However, he investigated and found an alibi witness. So he was then armed with corroborating evidence and his client swearing that it was true. Well, this corroborating witness was a pretty weak read, was he not? I agree that Adkins could have been better, but if you look at the two defenses, the one that was given, the one that was given was my client wasn't there, whoever was there was involved in a shootout, that person got the better of the deal, that person wasn't motivated by robbery because they left a bunch of money behind, my client was left-handed, and the bullet angle doesn't match. And the defense he's now saying should have been given is that same exact defense, except rather than I wasn't there, I was there and I pulled the trigger. Given that Adkins establishes that he thought somebody else was the perpetrator, it would have been probably the reverse of ineffectiveness if he had given, contrary to his client's testimony and contrary to Adkins' version, never mind what my client said, never mind what Mr. Adkins said. My client was, in fact, there and he was involved in self-defense. That couldn't possibly have been a better defense strategy than the one that was proffered. In addition, the premise that Mr. Martin said I never thought Phillips' alibi defense had any merit, he did say that and he's now since clarified that during his deposition testimony, as I outlined for the Court a moment ago, that he's explained that he believed that the defense still had a chance to succeed, that Phillips would still be viewed as the more credible person than Coleman or Rose. Also, that seems directly contradictory, however. He admitted in the deposition that the phrase didn't have any merit was a poor choice of words and that's never what he meant. One way to view this is when he was first asked to tell what he knew, he wasn't under any concern that he might be charged with ineffective assistance of counsel and it was only after that came out that he began to change his story. Is that proper? Well, I think the better explanation is from the second declaration in which he agrees that he didn't have the materials to review at the time of his first statements. One of the things that's important to remember is that the premise that Phillips is making here is that some magic phrase out of Martin's mouth could have changed his mind about testifying and swearing to alibi. However, Phillips could not possibly have been talked out of the alibi. During his deposition, Martin repeatedly tried to get the names of the alibi witnesses. He warned Phillips repeatedly, your alibi is weak unless you tell me who you were with. He warned him about the severity of the potential punishment. He told Phillips that he would be subject to cross-examination about the persons he was with and that if he refused to answer, the judge could strike his testimony entirely. He even rehearsed with Martin or rather Martin even rehearsed with Phillips many times how to take the Fifth Amendment as a result of his knowledge that he was not going to answer these cross-examination questions. Despite all of this repeated warning and repeated discussion by Martin, Phillips steadfastly maintained that he was not present and even said to his lawyer, I'm a pro. If I'd been there, the job would not have been so sloppy. How many times did Martin meet with Phillips? It's unclear to me exactly how many times they met, but. Someplace in the record, I saw that it was four times. That's an allegation by Phillips that's been unsubstantiated. I would posit that when you add up Martin having repeatedly talked to him about all of these materials and having never complained below about the number of meetings between them, that any claim by Phillips now that they hadn't met adequately is patently false. Now, did Martin ever make a statement as to how many times he visited Phillips? I don't believe he did. One of the problems that we have now, of course, is the number of years that have gone by, and I would posit that Martin is an inherently credible witness and who was unwilling to say things that he could truly not remember. Well, clearly Martin should have been keeping time records, and he should have rebutted that. He turned his file over and did not have it at the time of the depositions. But at some point, if he disagreed with that, he surely should have tried to make the point, because that's almost proof of not paying enough attention to your client. Well, I would posit that Phillips is not a credible source for such a claim. Also, beyond the fact that I posit that counsel's performance was adequate. Was that one of the grounds in this case? I don't believe that was raised below. It wasn't raised below? I don't remember hearing about it in the district court. I was thinking, I'm not prepared on how many times Martin met with Phillips, and I was wondering whether we need to adjudicate that so that I can review it. I don't believe that it was an issue below. I don't believe the district court addressed it. I think it's something that Phillips can bring up. Well, it's not an issue in itself how many times. The question is whether he repeatedly had discussions in which he advised Phillips of something, and Phillips refused to do it. Or whether he met once with Phillips, for instance. I'm not suggesting he met once. But we're trying to, what is an issue here is whether Phillips' discussions or Martin's discussions with Phillips, how that affects the question of what Martin's duty was to investigate either the alibi or other things than the alibi. Was he entitled to disregard all other forms of investigation? Because Phillips repeatedly told him, I insist I wasn't there. That certainly is an issue in the case. And all that I think that Fletcher's asking about are what are the facts about how many times he had this discussion with Phillips? All I have is that Martin repeatedly discussed it with him. It's also important to note that from Martin's deposition, he makes it abundantly clear that he did not investigate any particular defense. Well, what I have here is as far as suspense of his alibi, did you on many occasions advise him of the strengths and thus the weaknesses of his alibi claim? Martin answered, I can't attach many. I'm neither admitting nor denying there were many. I know more than once. In the supplemental excerpts of record at pages 463, 466 through 67, 486, 464, Martin discusses repeatedly trying to get the names, repeatedly advising him that his alibi was weak without corroboration, warning him about the severity of the penalty. That's a supplemental excerpts of record 487. Telling him that his testimony would be stricken if he doesn't answer cross-examination questions. That's at 467 and 488. Those are different issues. And whether he said to him, as I recall his testimony, he said if he had been aware that there was evidence about the shootout, that then he would have explored that defense. And in fact, he was aware of it. He thought he hadn't been given that information, and he had been. That was in 1990 at a time before his memory about any of these matters had been adequately refreshed, as reflected in his second declaration. So Martin's definition... Who refreshed his memory on these things? I imagine he was provided by my predecessor counsel with materials from the trial in anticipation of the declaration that he drafted as his second statement. Well, my point is that counsel was armed with his client swearing he wasn't there, finding a witness who backs up that story, and Martin made it clear in his deposition that he didn't investigate a specific defense, but rather he focused on the case generally. He looked at all of the physical evidence, all the documentary evidence. He even continued to focus on the crime scene and the manner of killings even after Phillips swore he was not present. He even pursued a psychiatric defense with George Solomon, the infamous psychiatric doctor who came up with the Twinkie defense. So I don't think it's a fair characterization of the record to say that Martin investigated a particular defense to the exclusion of others. He investigated the case generally, and he found that... What he said was if I had information of a possible shootout, which is now undisputed as he did have, I would have discussed a shootout defense with my client extensively. Without that information, I have no reason to discuss it. Well, that's what he said at the time of his testimony, and his testimony was unrefreshed at that time, and he subsequently said that that was not correct. It's also important to notice that no matter what this Court thinks of Mr. Martin's conduct, there's no possibility of prejudice here. There's powerful evidence of guilt sufficient to give this Court confidence in the outcome. He told his mother, Mr. Phillips told his mother that the police were looking for him, but don't say anything about the Toyota because it's not related. The jury heard how he described a bullet going through him because I could hear it go through the body of a car. You know, the issue here is whether there was an intent to rob. Isn't that what the issue is here? That's one of the issues that's wound up with these special circumstances, and I believe that Ron Rose's testimony as the star witness powerfully brings that home. Phillips set the location of the meeting. He set the time and place. He already had $11,500 of their money and urged Rose to bring as much cash to the meeting as he possibly could. Phillips asked both men for matches at the second gas stop, demonstrating that he was gasoline over him, further demonstrating his premeditation by bringing the gas to the scene. Rose testified that he heard a man's voice as he was being searched. There was only one man left standing, and that was Phillips. And the money was in his top pocket of his shirt or jacket. That's correct. And if the intent was robbery and this was all arranged to come up so he could steal that $5,000 and he couldn't find it when it was in his top jacket pocket, he just abandoned that robbery? Martin argued that very thing below, and the jury rejected it. To say that Phillips perpetrated a perfect crime would not be true. He made several mistakes. Well, nobody did a perfect crime, but if your purpose is robbery and the money is evidently where you can get it, and you say that he went into his pockets and he took out his wallet and he went into the back of the car to get a gun, the one thing he didn't bother to do is to get the money that the purpose of this whole crime was? He searched for it. He missed it. He lamented later to Coleman, being frustrated about having not found it. I didn't quite understand where the money was. As I recall, these people are all burned up and bloody, and he finds the wallet. Well, they weren't burned up when he searched. They weren't burned up when he was looking for the wallet. Rose made it clear in his deposition that he got the wallet out of the pants pocket. That's correct. And searched the pants. And he searched the pants pocket for more. That's right. Now, the rest of the money, I didn't quite get it. Was it like a suit jacket where you have it in the inside breast pocket? It was a Levi's corduroy jacket. It had a button flap breast pocket, and that's where Rose says the money was. But he said that Phillips searched. You mean the kind of breast pocket that's on the outside of the jacket? Correct. And it's a thick roll of $5,000 consisting of $100 bills. I believe he said not roll. I believe he said folded in half once. Folded in half, $100 bills that totaled $5,000. Phillips missed it. Phillips made other mistakes during the crime. This was the whole purpose of this episode. To the extent that he missed the money. Well, that's the issue. I mean, is the whole purpose of this the robbery or the murder? And if it's a robbery, he managed to find a gun, which he said was in the back of the car. He managed to find his wallet. He found some other things. But what was the most prominent that he had set this all up for, he didn't find. He did not find the money that he was after. Where was the breast pocket relative to the holes in the man's body? The holes on Rose's body were from left to right. And I believe they were in the torso predominantly and the arm and the head. There were five bullets that struck him. You know, I'm not questioning the guilt or innocence of Mr. Phillips. He's guilty of something. The question is, is he really guilty of setting up a robbery and the murders incidental to the robbery rather than vice versa? And then the question comes down to did – was counsel ineffective in not making that argument or the evidence or whatever was necessary ineffective in respect to presenting that to the jury? Counsel did argue that. He argued that whoever was present didn't take a large sum of money and therefore was not motivated by robbery, and the jury rejected that very argument. Well, that's not the question. The question is not whoever was present. The question is did Mr. Phillips, the special circumstance phase, did – the State's theory is he did all of this in order to get the $5,000. And does that theory make any sense when he didn't do the elementary thing that would have gotten him the $5,000 but left it there? The fact that he was unsuccessful doesn't undermine his intent to steal and rob those persons in the occurrence of his crime. Well, it raises a question about whether that was his intent. If you assume that was his intent in going up there and doing all these things, then the fact that he's unsuccessful doesn't change the fact that he had an intent. But it raises a serious question about whether that was the reason for all of this when that seemed to be of no great concern. Well, I disagree. When he got back into the car, he lamented several times to Coleman that he couldn't find the money that Rose was supposed to have brought with him. So that adds powerfully to Rose's testimony about bring as much money as you can. I believe the robbery is shown and that the jury has already rejected the very claim that it wasn't a robbery because he left behind the money, because Martin made that exact claim. There was a robbery. He stole some things out of the car. There's no question about that, the $126, the gun, the wallets. No question there was a robbery. The question is, was his whole event based on the fact that he wanted to commit a robbery and the murder took place in the course of that robbery? Or did the robbery take place after the murder? And by robbery, we're talking about different things. I mean, one is that this whole scheme was set up to steal the $5,000. Now, I'm not talking about what happened, what's right, what's wrong. You're talking about prejudice here. Could one of the jurors have concluded that I'm not positive or it's not beyond a reasonable doubt that that's not the way it happened, that the robbery was not what this was all about? But that it was the murder. I believe that the robbery facts were amply provided to the jury by the testimony of Coleman and Rose. Well, let's turn to the testimony of Coleman and talk about her motivations at the trial. Coleman did not give false testimony. She candidly explained that. Well, didn't she once tell the police it was a shootout? I'm sorry. Didn't she once tell the police it was a shootout? She told Dr. Reville that it was a shootout at Phillips's behest. She lied to Reville at Phillips's direction. How do we know that she lied when she said one thing at Phillips's behest and that she didn't lie at the behest of the state, which was going to let her off a first-degree murder charge? Because he threatened that if she crossed him and went to the police, that if he couldn't get to her, he would find somebody who would. And he threatened her with that life threat five times. She was a 19-year-old girl who was manipulated by him. And when he told her that she needed to do something, she was so afraid she would do anything that he said. And she wasn't afraid of being executed for first-degree murder. That wouldn't have been an incentive for her. I don't believe that she felt that she was complicit in the crime in any way, which is why she rejected any offer by Peterson to do a year in jail. She didn't think she should go to jail because she hadn't done anything wrong. She didn't know anything about the crime. This girl knew how to make a better bargain than one year. I'm sorry? This innocent young 19-year-old girl knew how to make a better bargain than just one year. She got off without anything. And also for the next cocaine deal that she got arrested for, she also got off of that. There's no ---- Let's not talk about innocents here. Nobody's innocent. These are not very nice people, any of them involved in this case. Well, relative to Phillips, I would consider them all to be angels. Coleman's testimony simply was not false. This case should be decided under the Will Hoyt standard because there's ample evidence beyond Coleman in the form of Rose's testimony and the other circumstantial evidence connecting Phillips to the crime, and Coleman's credibility was sufficiently before the jury. Counsel, what do we do with the prosecutor's conduct? In closing argument, he says, what bargain? We don't know. It doesn't even make any sense. I just suggest to you that that kind of argument is sheer fabrication. I don't know what to make of that, but I believe the issue of a secret ---- I believe that the objective of the case is to ensure that the prosecutor is a good lawyer and a good prosecutor no matter how this case should come out. First, I would posit there's no harm from that. Also, I would posit that Minear admitted to the jury she's hoping for consideration and leniency. That's why she is testifying. She's telling the truth in the hopes that she may later be treated leniently. The case against her has been continued for two years so that she could testify, and Minear also advised the jury that she was an accomplished and that they should view her testimony with distrust. Coleman also candidly admitted to the jury that she expected fully that the prosecution would take her cooperation into consideration. She admitted she'd been arrested on a murder charge, she'd posted bail, and then she'd be released on her own recognizance. Her preliminary hearing had been continued numerous times, and the parties stipulated that the number of continuances was unusual and seldom granted for so long, and the jury was informed and learned that Coleman was engaged in prostitution. They knew that she arrived and left with Phillips, and they were instructed that as an accomplice, her testimony must be viewed ---- must be corroborated and must be viewed with distrust. And Attorney Martin brought home the subject of her potential benefits powerfully to the jury. He said to them, obviously there's some kind of anticipated deal here. Better off hold the murder charge over her until you get the testimony you want. Then close the bargain. Hold the murder charge over her head to compel her to testify. She's singing like a bird, the tune that they call. Coleman sold her soul. She's charged with murder that's hanging over her like a large anvil. She is going to say what they want. Coleman's testimony is just a story which was bought and paid for. She waited until she had a deal to finally disclose Phillips' whereabouts, and then Martin closed with, and the case against her probably will be dismissed when Phillips' trial is over. Her credibility was before the jury in this case. They had ample to decide whether she was telling the truth. And the way we know she's telling the truth ---- Kennedy, it doesn't mean necessarily that somebody either lies with every answer to every question or tells the truth with every answer to every question. Clearly, the jury believed her basic story. You know, but that doesn't mean that everything she said was true just because they found that he was guilty of the murder or the robbery. Clearly, he was guilty of the robbery. But it's not just rejecting everything a witness says. When a witness has this kind of incentive to tell the kind of story that will help the prosecution, it doesn't mean she's going to make up the fact that Phillips was there and fired the shots. It doesn't mean that everything she says about what happened that evening and what conversations there were and what Phillips said, that the jury is going to believe all of that, too. The jury was instructed that she's an accomplice, that her testimony must be viewed with distrust and is subject to corroboration. So they were able to compare her testimony with that of Rose's to determine whether, in fact, she was telling the truth. And the jury is ---- That's what I said on some of the facts, maybe the main facts. You just said a minute ago she came back and said, well, there's no corroboration. Sorry? I said, you just said a minute ago that this nice young lady, 19-year-old girl, as we call her, the 19-year-old girl, came back to the car. And there she had a conversation with Phillips. Well, there's no corroboration for that. They could believe her on the essential things. And that doesn't mean they're going to believe that Phillips said to her X, whatever it is. There's no corroboration for that. Valid, but Rose established that the motive by Phillips was to rob these people of money. Rose explained credibly to the jury about how he was badgered to bring as much money as he could, that he had already given Phillips $11,500 and a promissory note for desert property. And the premeditation is established by the matches and the gasoline. Rose was shot from the position where Phillips alone was standing. The jury had ample to decide this case that this was a murder in the furtherance of a robbery. Since there's no chance that anything Martin could have said would have changed Phillips' alibi position, he cannot be found to have either provided deficient performance or ---- Suppose he had. Of course there were things he could have done that might have given the jury a totally different issue, which he never investigated because he said he didn't have the facts. The facts that he did have. Had the jury been presented with an argument that Phillips went up with a gun, they had brought guns or one of them, Rose, had brought a gun. And then somehow, as Coleman said, there was a shootout. The jury would have had a different case, which I don't know how that would have come out, who would have believed what or what the jurors would have believed. But, of course, your argument now is the jury had nothing presented to them that would have caused them to reach a different result. That's right, because defense was alibi. What would the jury have done had they been presented with a shootout issue? Were these not very nice characters involved in these drug deals? Who was the double crossing whom? I don't know what the jury would have believed. That's a hypothetical trial that didn't occur. Well, of course it didn't. But you were saying there was nothing presented to the jury that would have led them to believe X. Well, that's true. But that's the issue here. Should there have been something presented to the jury that might have led them to believe something else? Phillips wasn't going to change his position no matter what Martin did. Martin repeatedly tried to get him to explain his alibi position. And Phillips's response was I was a pro. If I had been there, the job would not have been so sloppy. That is not the statement of a person who with some magic phrase is going to change his position and say, okay, you're right, I'm not telling you the truth. So the premise that he would testify differently if Martin had said some magic thing is faulty. There is no basis to conclude that Phillips would spontaneously have changed and said, okay, I was there, it was self-defense, if Martin had said some magic thing. And even if he had, there still would have been ample evidence to convict him. Martin made the very arguments that Phillips is faulting him for not making. He said there was a shootout. Rose shot Bartulis. The perpetrator was unmotivated by money because he left a bunch of it behind. He artfully utilized the pathologist, left him some room to argue the direction of bullet travel. He also argued that his client was left-handed and that couldn't have fired the bullet from his position based upon the bullet trajectory. The only thing that Martin didn't argue that Phillips now wants him to argue was that it was Phillips who did this instead of some other perpetrator, as supported by the witness Adkins. All right. Mr. Phillips. I'm going to speak first, if you would, if you may, please. Yes. May it please the court. In terms of Ron Rose, I think this court needs to look at the fact that there was an earlier interview of Ron Rose. I believe when he was at the hospital, and he says nothing about the matches. Now, obtaining the matches has been used as one of those indicia of premeditated murder. Both in his earlier interview and also in Ms. Coleman's December 28, 1977, three-hour interview with law enforcement, Sharon Coleman says nothing about the matches. She was asked in the interview about how I don't know. I don't know. I guess he had matches. There was no testimony. Counsel, listen, I don't know how that helps your argument. If this had been so premeditated, you would have thought he would have brought the matches. The fact that they're saying he only by chance got the matches from them doesn't seem to me to help the state's case of premeditation. Well, that's my whole point is that there are prior inconsistent statements that are given by Rose and are given by Coleman that show absence of premeditation. And I earlier in my opening argument alluded to the fact that Sharon Coleman, in transit from Fresno back to Sacramento, said nothing in her interview to law enforcement in December 28. She said Phillips didn't say anything about there wasn't enough money on them. That's a three-hour interview, and she says that in that transit that Phillips simply says they double-crossed me. They were going to double-cross me. The evolution of her testimony from that point until the point of trial two years later is that a trial after she has been insulated with, you know, the so-called secret deal after she had the get-out-of-jail-free card from Pete Santayana, who didn't file heroin possession charges against her because she was a witness in a murder case, that her testimony gets more and more severe against Phillips. Ms. Hart, can I ask you a question? Yes. You said that her original statements in her interviews did not include anything about his saying that he was disappointed about not finding money? Yes. The original statement was that he had felt that he had been double-crossed. To whom was that interview given? That was given to detectives on December 28th of 1977. I believe that was Detective Seymour and Detective Flores. Okay. Thank you. The fact that Sharon Coleman may have been hoping for consideration and the fact that Paul Martin seized upon an undisclosed deal saying that she's singing like a canary and he argued that that does not in any way dissipate the taint of the prosecutor, David Menier, in coming to the secret deal. I mean, this court has previously ruled in haze and has found that secret deals can tend to cause a witness to shade their testimony, to change their testimony, and to make their testimony even more damaging or against the defendant and more favorable to the prosecution when they don't know the deal as when they do. And I know that there's a case of Jackson v. Brown, 513F3-1057, a 2008 case that involves, again, this issue of nondisclosure. And that case was a jailhouse informant, not a recipient witness, a jailhouse informant, who was not disclosed that he was given indocence for testimony. And this court said that had the jury known about the indocence for testimony, it could have caused the jury to give little or no credence to the damaging testimony. In that case, this court set aside the special circumstance, not the whole underlying conviction, but it said that there was a reasonable likelihood that the false testimony could have affected the judgment of the jury. And that's the test here, not whether one could look at Ron Rhodes' testimony and induce a robbery from it. That's not the test. That's a test on appeal, a substantial evidence test. I submit the test here is different. Was there any reasonable likelihood that the false testimony or the effect of the false testimony about there not being a deal could have affected the judgment of the jury? And we submit that, yes, it would have been an entirely different trial. One other point I wanted to make is that in his deposition that I took approximately six years, Ron Rhodes admitted to me that his .44-caliber weapon that accompanied him was his, quote, constant companion, unquote. And with that, I'll leave the rest to Mr. Thorpe. Counsel, I have a question for you. Oh, yes. On the deficient performance. Yes. Would it have been required for Phillips' lawyer, Martin, to perform adequately, that he tell Phillips to testify that he was there and it was a shootout? No. He could have left Phillips out of it. I mean, the thing about ---- How was he going to present the shootout defense without Phillips testifying to it? The girlfriend didn't testify to it. The victim didn't testify to it. The other victims did. How was he going to present it without Phillips? They were going to present it through ballistics testimony that were never secured. That Mr. Thorpe outlined it in his opening brief. But I thought the ballistics testimony went the other way. It showed the bullet came from where Phillips was, not from where the other person in the car was. Rose? Well, I believe that Mr. Phillips has outlined in his brief the fact that there are more bullets and more shots than were accounted for by what was simply in his gun. And I believe we had the statement of Sheriff Bates at some point on sifting through. Okay. So what you're saying, if I understand it. Any ammunition that thereupon showed that Ron Rose was not telling the truth when he said that his ammunition was separate from his gun. Counsel? Yes. Tell me if I understand you right. You're saying he could have put on the shootout defense without putting Phillips on the witness stand because the ballistics evidence would have raised a reasonable doubt? Yes. And he also would have used Dr. Revelle, to whom Sharon Coleman made the statement sometime before December 28th of 1977. But after she had agreed to turn herself in, he would have used the statement that had been made to Dr. Revelle about Sharon Coleman  and then used impeachment through Dr. Revelle to secure that statement. So he would have two things. He'd have ballistics evidence and Coleman's statement to Revelle to create a reasonable doubt about the shootout. Yes. And he would not. Counsel, I'm leading up to my question here. And he would not have to put Phillips on the stand. But as I understand it, Phillips insisted on taking the stand. Is that correct? I don't know. I'll have to defer to Mr. Phillips on that, whether he insisted on taking the stand. I'm not sure that I can answer that. The court asked me how that shootout defense could have been put on. Yes, it could have been through Phillips' testimony, but I'm trying to give an alternative of how that shootout defense could have been adduced at trial without his consent. The problem I'm getting at, Ms. Hart, the problem we're having is there's a time gap. Hold on a minute. The problem we're having is there's a time gap between the speaking and the receipt of the message, so that people talk at the same time because they don't know the other person is talking, which is why it's much more satisfactory to have arguments made with everybody present. But we'll have to do our best. Did Klinefeld have a question? My concern is it's unethical to tell your client to lie. As a lawyer, you really don't know what happened because you weren't there yourself. The lawyer really does have an alibi. So you pretty much depend on your client and your investigation to find out what happened. And I'm trying to think how the shootout defense could be put on with any effectiveness without putting Phillips on and telling him to testify to what Phillips had said was false. Well, obviously, an attorney cannot put on knowingly perjured evidence. We know that. But I guess the situation certainly could arise where your client tells you that he wasn't there. Indeed, I mean, that just happened to me in the 50 or 60 murder trial. It happened to me all the time when I did criminal defense. A lot of them tell you they weren't even there, and then you confront them. And then you confront them. And then you turn up the facts and then you confront them. And as counsel said, if he had had facts that showed a shootout defense, then he would have confronted Mr. Phillips with those facts and said to him, look, here's what the facts show. And then if Mr. Phillips changed his story, he would put him on. I think you're all in agreement that defendants change their stories when confronted with the facts. So we're out of time, except you, I think, took some of Mr. Phillips' time. You said you were going to give him and we'll give you two minutes if Mr. Phillips. Thank you. A couple of quick points there. First of all, as to the state has never refuted the claim, the alibi defense came from the very first meeting between Rose and I when I told him, screw him, I'll just say I wasn't there, or between Martin and myself. The second point I would make is that the state has the visiting records. The state has available the billing records, which would demonstrate the number of times that Martin and I met. They have never refuted the assertion that it was four meetings only. Next, the intent, earlier the court questioned about the intent to rob versus the intent to kill. There's also the shootout, and I ask you to listen to the tape of your own response to my rhetorical question during last oral argument when I said, why would Sharon Coleman, who had decided to turn herself in, then lie to rebel at my behalf? And that opens the point that there was neither an intent to rob nor an intent to kill. Next point, the issue about not finding the money must be taken into consideration with the fact that Rose had money and not one but two points on his body, yet the only thing that was taken from him was his identification. Finally, the state's statement there earlier about the promissory note being for desert property, there was never any testimony, there's never been any statement, declaration, et cetera, that there was desert property involved. Only where that came up was Rose's initial lie to law enforcement that the money was not for cocaine investment but for vacant property. And finally, the state has not refuted the ballistics evidence that not only Sheriff Bates' testimony supports, but the only ballistics evidence that we have is the photographs provided by the state because of the ranchero being destroyed, and those photographs also support the fact that the shots that went through Bartulas could not have come from where I was standing. All right. Mr. Phillips? Mr. Phillips, did you testify and did you testify against your lawyer's recommendation? Did I testify against his recommendation? No. I didn't phrase that clearly. Did you testify and did he recommend that you not testify but you testified anyway? No, that's incorrect. Okay, say what is correct. Counsel said, do you want to testify? I said, why not? I mean, there was never any coaching about this is how you take the fifth, all of that that came out later on. That was the first I heard of it. He made up that stuff about educating you on taking the fifth? That's my word against his, and my word has no credibility, so it's not worth discussing. All right. Thank you, Mr. Phillips. Thank you. Thank you for your time and patience. All right. Thank you very much, counsel. Thank you. Thank you, counsel. Well, I guess this is the end of this hearing. I think we started these about 15 years ago. Let's hope we can conclude this case at some point. All right. Thank you all very much. Court will adjourn.
judges: B. Fletcher, Reinhardt, Kleinfeld, Cjj